and we have Mr. Richard Whitney for the appellant, and we have Ms. Rebecca McCormick for the appellate. Thank you. Good afternoon, Your Honors, and may it please the Court, Counsel. Although I've raised five issues on this appeal, one is clearly paramount. At this moment, Defendant Elijah Van Zant is being confined at Shawnee Correctional Center despite compelling evidence of his actual innocence. Dr. David Lightfoot, Ph.D., who runs the genomics facility at Southern Illinois University at Carbondale, testified in a post-trial affidavit and hearing that the very same DNA evidence relied upon by the State in large measure to convict Mr. Van Zant actually shows to a reasonable degree of scientific certainty that the defendant, quote, did not touch the handgun in question ever. When presented with this testimony, which turns the DNA evidence from maybe slight evidence of guilt to very high probability of innocence, the response of the Court below was to conduct an inexplicably truncated hearing saying that it didn't need Dr. Lightfoot to elaborate on his determination and then issue an order denying the motion and supplemental motion to vacate the judgment and for new trial without a single syllable of explanation. Under the very same standard that we apply to a petition under the Illinois Post-Conviction Hearing Act, this evidence would compel a new trial. The only difference here is that in this case, the defendant happened to discover the new evidence prior to sentencing, thereby allowing the post-conviction relief to be granted while the trial court still had original jurisdiction. But under the same standard, he should have gotten a new trial. Instead, we get no explanation. The evidence is seemingly disregarded. Dr. Lightfoot's evidence is compelling. He, looking at the same evidence, he determines, on the one hand, there is a whole question of the evidence being degraded by the failure to find adequate samples of the DNA. There are alleles found on the handgun that are not found in the Van Zandt sample. But most compellingly, there are alleles in the Van Zandt sample taken from the defendant that are not found on the handgun. And that, to him, is what's really dispositive here. It allows him to reach this conclusion. And bear in mind, Your Honors, and this is something I may not have emphasized sufficiently in the briefing, that if Defendant Van Zandt had touched the handgun, it would have been right before the handgun was recovered. It would have been a fresh sample of DNA, not this kind of lump of, well, we had trouble getting enough of the sample. We couldn't send it to the FBI because it didn't meet the CODIS standard. We had to do the separate Y test, and then we found some match that maybe 3% of the population would also match. This would have been a fresh sample. There shouldn't have been those issues there if Van Zandt had actually touched the handgun. So when you combine the Lightfoot affidavit from the very equivocal and compromised evidence that was presented at trial, clearly there was enough evidence here to warrant sending this back, vacating the judgment and sending it back for a new trial. And, of course, that's what I'm asking this Court to do. Now, I could go through, I didn't read how it meets all four standards. It was discovered since the trial. It could not have been discovered with the exercise of due diligence. We just happened to get this expert. The client was indigent, but we were basically fortunate to have an SIU professor who, after the fact, came on and said, well, now I've looked at this. Yeah, there is a real problem here. It's plainly material to the issue, and I'm not even talking about the Cole affidavit and the other things, just focusing on the Lightfoot affidavit. And, obviously, there's a substantial likelihood that it would change the result to have an expert saying, no, this shows that he couldn't have touched the handgun. So when you look at these, Your Honors, this clearly, in and of itself, is reason enough to reverse and either enter an order reversing completely or at least vacating the judgment below and giving the defendant a chance for a new trial. Just as would be the case if he had filed a post-conviction petition separately and we had consumed more court time going through that whole procedure. Instead, we're at least doing an on-direct appeal. As soon as we were aware of the evidence, we brought it to the lower court's attention. Now we're bringing it to this court's attention. So I'll be happy to talk about the other four issues I've raised in this appeal, but my view of this is that you probably don't need to reach those because this one is dispositive here. Probably the second strongest argument would be the fact that we have a case where the jury's verdict was against the manifest way of the evidence. And I list a whole raft of reasons why this was the case. And I realize, Your Honors, that's a high threshold. We don't ordinarily want to undo the work of a jury that was hearing the facts firsthand. But this case for the state was so weak and so compromised that I think this was a case where you have the occasional irrational jury that was swayed by prejudice, passion, or something else, or whatever they wanted to convict this guy. We have a case here where the one eyewitness never sees him actually handling the firearm. We have, and the only thing that they were able to do on top of this, highly circumstantial equivocal evidence. And there's photographic evidence indicating that he said he couldn't see it when the photographic evidence actually tells you, yes, he should have been able to see it if, in fact, Van Zandt was handling the weapon. He doesn't have to handle the actual weapon, does he? I mean, he can handle the bag with the weapon in it. Well, true, but he never sees him with the bag or the weapon. You know, there's nothing, I would agree with you that if it was, you know, in a holster or anything else, you don't have to literally touch it. But, you know, what Detective Williams was trying to say is that based on his observation, it must have been him putting the weapon in the bag. And so you have highly circumstantial evidence as far as any kind of eyewitness testimony. And then what the prosecution attempted to do in this case was try to bootstrap this highly equivocal DNA evidence to kind of bolster the case, even though, you know, all it really did was reduce the realm of suspects to, what was it, three percent of the Caucasian population and three percent of the Hispanic, one percent of the African American, excuse me, one percent of the African American Hispanic populations, which still is a pretty large population that could have handled this handgun. And then on top of that, you have the fact that Detective Williams says he twice touched Van Zandt on the body, his nervous, sweaty body, twice before handling the handgun. So even if there were some value to the DNA evidence on the state side, he contaminated it. So, you know, so even if this three percent, one percent, one percent is considered sufficiently probative to go before the jury and that's one of my other issues that it probably should not have been. But even if we assume argument, though, that it should have, it was contaminated, it was compromised evidence. So, you know, from that standpoint, it should not have been allowed in. And if looking at it from the manifest way to the evidence standard, how could the jury rationally find, well, this was enough to support a conviction beyond a reasonable doubt. And I cite a number of other arguments as well that really, I think, in total show that they did not have enough to convict beyond a reasonable doubt. Did the detective or policeman, did he say he handled the weapon other than pick up the bag? Yes, because he said he put it back in the bag. Oh, he took it out of the bag.  And then he placed it back in the bag and then put it in the same spot in order to take the photograph. Well, that indicates that he must have handled it in order to put it back in the bag, take it out and put it back in. Never said anything about having gloves on at the time, anything like that. So, I think that there was reason to believe that the, whatever sample was recovered was itself compromised by him first touching the defendant's body and then touching the weapon. The other issues we raise in this appeal, one has to do with whether it was, we had asked the court below to include evidence that this was a high crime area and, in fact, right in that same neighborhood, there had been a shooting where they never recovered the weapon. And I realize that that's not hugely appropriate, but we felt that we should have at least been able to present that to the jury because ordinarily, you know, it's not something you see in every day occurrence. You're walking in somebody's yard, oh, there's a bag with a handgun. That would normally be considered a highly unusual occurrence. But in this particular neighborhood in Carpentale, it would be a less unusual occurrence, particularly since the police had just recently had a crime there where they never recovered the handgun. We simply wanted to present that to the jury. The court wouldn't even let us enforce it. And that was about a block away. I'm sorry? About a block away there was a crime. Yeah, about a block away, yes. And the court below wouldn't even let us enforce our subpoena to find out exactly how much other crime had been occurring there, saying, no, you can't do that. And then the other final issue on the appeal that we raise had to do with when you have DNA evidence this equivocal, you're not, you know, making a one out of four quadrillion people that could possibly be a match. You're talking about three out of a hundred, or in the case of talking about the Hispanic, or excuse me, the Caucasian population, three out of a hundred, this defendant was Caucasian. We're not at that kind of astronomical ratio that we normally see in these cases. And as I pointed out, I think this is the case of the First Depression. The argument we try to make to the court below when we're presenting here is that what you end up having is, you know, the cachet of DNA evidence without the substance to it. And we argue here that it's the CSI effect, you know, that people hear, oh, DNA evidence, well, that's important, that's, you know, if they have DNA evidence, that's a guarantee. This is a novel argument. I understand this is probably the first time, maybe it's the first time you've heard it. I cite in the reply brief some of the law review articles that have been written about this. But basically, my argument is that when you have something this low a threshold, three out of a hundred, the prejudicial effect, the tendency to confuse and mislead the jury outweighs the probative value, and so forth. And in response to one of the cases cited by the state, we cite the Harvold case, which was back in the day when they were talking about blood evidence, which kind of supports our argument there, that when you have probability, in that case, it was like one out of 500, there is a chance that this is going to raise considerations of unfair prejudice, and the jury may not be considering, well, one out of 500, that's still a pretty large population. It was too prejudicial. Here we have three out of 100. And accordingly, we believe that the tendency to confuse, mislead, or unfairly prejudice the jury outweighs the probative value of that compromised DNA, of DNA evidence, particularly when you couple that with the other questions raised by the state's witness about the problems with the sample, the failure to get enough of the sample to meet the FBI CODIS standards, and all the other things that compromise the state's evidence at this point. Clearly, it should not have gone to the jury. So with that, unless there are any other questions for the Court, I will reserve the rest of my time for rebuttal. Thank you, Mr. Whitman. Thank you. Mr. McCormick? Your Honors, Counsel, I'll take up in the order that the defense has presented their case and take up with the motion for new trial. The defendant had a burden to show in his motion for new trial that his new evidence was such a conclusive character that it would have probably changed the result, and that it was material to the issue, and that it was discovered after trial and could not have been discovered with due diligence before, reasonable diligence before. Now, as to Dr. Lightfoot, I'm sure he's very well credentialed in the field in which he is an expert, which is plant DNA. He's not an expert in DNA, in human DNA testing. And the Court commented that the Court recognized that he was not an expert in human DNA testing. So that's the first infirmity in Dr. Lightfoot's testimony. The second is that he didn't perform any new testing. There is no new test. He didn't perform any new test on the gun or the DNA sample or anything. This is not new evidence. All he did was critique from a person with his expertise in plant DNA, critique Stacy Spieth's testing, and that is nothing more than impeachment evidence. It is not new evidence of actual innocence. It's not new evidence. But, you know, at the beginning, he's not accepted as an expert in human DNA testing anyway. So the Court absolutely gave no weight to this, that he did not present any evidence through Lightfoot that he merited a new trial. It was not new evidence. As to the other issues that he raised in his motion for new trial, Shanidra Cole's writing, which the Court, even though it wasn't notarized, the Court still agreed to look at it and consider it as evidence, even though she did not testify at trial. And the gist of that is she overheard Stacy Spieth have a conversation with a deputy during a break in trial, and Stacy Spieth was the DNA expert that conducted the test. And that she made the comment that defense counsel's questions had been too scientific, and also made the comment that the first test that she had done had come back with a lot of female DNA. Well, and then Stacy Spieth testified at the hearing on the motion for new trial, and she said, yes, it did come back and a large component of the mixture was female DNA. And that's why she went ahead and did the YSTR test, which tests only the male fraction. And so there's nothing exonerating about this evidence that there was female DNA in the mixture of DNA on the gun, because the defendant happens to be male and that they were female doesn't do anything to exclude him. So that's of no use. The fact that Dwayne Jones, it wasn't established at the hearing that Dwayne Jones lived at 311B East Elm Street on the date that the defendant was arrested for possession of the weapon. And the fact that he may have had a weapon some months after that was also a .38 is not relevant to anything either. So the defendant really showed nothing that in his motion for new trial that merited a new trial, and the court properly denied that motion. As to the DNA and the statistics, Stacy Spieth performed two tests. The first test, she examined nine instead of 13 loci, which she normally would have done, and she developed statistics from only four of those loci. So the number is going to be much lower because she's not using as many loci in determining her statistic. And in the YSTR testing that she did, that has a smaller database, but she testified this was recognized by the scientific community. And the statistics developed under this database are also smaller. So she came up with, under the PCR test, using only the four, one in three African Americans, one in four Caucasians, one in three Hispanics could not be excluded. Now that's the important part. It's just an exclusion test cannot be excluded. It's not, we're not doing a DNA for identity where we have to match every particular loci. This was to show who could not be excluded. And all it was was to show the defendant he could not be excluded as someone who touched the gun. And the same way with the YSTR. One percent of African Americans, one percent of Hispanics, or three percent of Caucasians could not be excluded. Now, Harbold is old law. It's pretty much abandoned. And cases that people have cited, Miles Lipscomb and Oliver, have determined that DNA, Redmond, I'm sorry, and Oliver, have determined that statistics developed from DNA testing, whether they're high, you know, so that you could have to have two or three universes of human beings to have someone else that matched for identity, or whether they're lower, say one in 466, who could have the same DNA match. That simply goes to the weight of the evidence, not to its admissibility. This is something for the jury to weigh. And it's not, this is established law, and it's not new. And the court was correct to deny the defendant's motion to bar her testimony about the statistics. And as to reason about, the defendant, as most defendants do, doesn't like calling standard, and doesn't like to take the evidence in the light most favorable to the people, and to determine whether any rational jury on this evidence could have convicted the defendant. In this case, using that standard, the defendant was found guilty beyond a reasonable doubt. Detective Williams was looking for, he was investigating a Berkeley case, saw the defendant sitting on the front porch at 311B, and thought he looked like the suspect. So he stops and gets out and walks toward him, and he sees the defendant gets up and moves away like he wants to avoid contact. He goes around the back of the building. Detective Williams has come the other way, and he sees him manipulating something on the ground. He's bent over, he demonstrates in court how he was bent slightly over, and he was manipulating something on the ground. He couldn't see what it was, but he knew he was manipulating something on the ground. So when, after the defendant's arrest, he looks in that area and he finds that bag, and inside the bag is a gun. Now, Detective Williams never testified that he touched the defendant or that he got the perspiration of the defendant on his body, or that, and he never testified about how it was he handled the gun. He never said that he, you know, had bare hands or anything. This is speculation. This is just something, this defendant is trying to throw in. It was not established that there was any transfer of perspiration or skin cells from the defendant to Detective Williams and then to the gun. This was not established. This is the defendant's speculation for the first time on appeal. It wasn't established below. And so I want to clear that up. There was also, I mean, something about fresh DNA. There was simply a limited amount of DNA. That's why there was, it was a small sample. But there was nothing about whether it was fresh or not fresh or contaminated, brought out at trial. So this is, this is something that's being thrown in that's not in the record. There was, Detective Williams did testify that when he arrested the defendant he could feel that his body was shaking and that he was extremely nervous. But there's nothing about him contacting the defendant's perspiration. So, there is the fact that the defendant is, he's seen manipulating something on the ground and in that area that where he was doing the manipulation they find the gun in the bag. That is strong evidence that he was, it seemed, possessing that gun at the time. But in addition to that was the DNA evidence of the sample taken from the trigger and the handle which said that the defendant could not be excluded from having touched the gun, which is some indication of possession if you hold something. And that,  the statistics which are, you know, for him, one in four could not be, one in four Caucasians could not be excluded or in the YSTR caskates one in 33, one in three. So, that was sufficient evidence logical evidence that a rational jury could have considered to find the defendant guilty of possession of a weapon by a felon. The defendant also stipulated below that he had touched a prior felon. And unless there are questions, I ask for your approval. Thank you. Based on that, what the counsel said last, did you have a transcript cite on where I could find the touching of the weapon or not touching of the weapon? I would have to. I'm sure that it's in our brief. I can cite. If it's in the brief, we'll get it. Yeah, but I can cite for you also where he touched the defendant's body. I know about that, but I was wondering about touching the weapon. Yeah, again, it's based on the fact that he talks about taking the gun out of the bag and putting the gun back in the bag after he had put his hand on top of the defendant's head when he was first frisking him. That's the first bodily contact. And then he says that he probably was the one who handcuffed him as well. So, and that's found in 210 and 214 and 215 in the record. So, counsel is sort of correct in saying, well, he didn't say I touched his sweaty body. No, but he did say I touched his body twice. And it was a warm day. The defendant said he had a jacket on and Detective Williams said he was nervous. He was visibly shaking. He made a big point about that. So, I don't think it's too much of a stretch to say that there was some perspiration on the defendant's body at the time when the officer touched him on the hand twice. So, it's not mere speculation. There are facts of record here. With respect to Dr. Lightfoot's qualifications, which was the first argument raised by counsel, first of all, it's important to note the court noted that, yes, many of Dr. Lightfoot's publications dealt with plant DNA. But the court didn't say that there was no finding that he was not an expert. The court said specifically we're not even going to go there. It's for the purposes of this hearing that he has the expertise that he claims. And then conceded the rule that it was somehow not relevant when he finally ruled on it. But the fact is that Dr. Lightfoot was able to testify that he had conducted some 60 forensic DNA tests on his own, of human DNA, and he taught the forensic DNA classes at SIU Carpenter. So, clearly he had expertise doing much of his published work on plant DNA doesn't, in no way defeats the claim that he, in fact, is an expert on human DNA as well. It is possible to have expertise in more than one area. As far as the fact that he did not independently conduct his own tests on the same samples, that's not dispositive here, and it doesn't relegate his testimony to mere impeachment. Evidence that presents a state of facts different from that to which the witness testifies is not impeachment. This is not a case where his testimony was, well, isn't it true that you used Stacy Spieth, you know, flunked your class in DNA testing the first time you took it. It's not that kind of impeachment. It's looking at the same actual report and drawing different conclusions from it as an expert. It's no different from a physician who looks at the same test results in a malpractice case, saying, well, look at this, the doctor number one made a false diagnosis. That's not mere impeachment. That's breaching a different state of facts based on the same body of evidence. There's no requirement that you conduct new tests in order to have a different expert opinion, and that expert opinion is substantive, not mere impeachment. So I don't think that argument can stand. The counsel talks about how there were fewer, that the reason why the statistical evidence of the DNA was at such a lower than normal threshold was because there were fewer loci to work with. And that's true, but that goes to our point. There were fewer loci to work with than were normal, or that allowed her to submit a sample to the FBI CODIS database because of the poor quality of the sample. So what does that tell you? The sample was compromised. It did come up to snuff, and accordingly, that was another reason why it should not have been allowed in the court below. And then finally, with respect to the arguments we raised on the manifest way and the evidence that basically challenging the jury verdict itself, as well as the motion for a directive finding, counsel is proactive in reciting the basic facts of what Detective Williams testified to. She does see the defendant manipulating something on the ground, but what she fails to talk about is, yes, the defendant testified that he was manipulating something on the ground. He was putting on a cigarette butt. He was smoking a cigarette, went around, bent over and put out the cigarette butt is what he was doing, is what he says he was doing, and in fact, there's photographic evidence showing that there were cigarette butts on the ground, and Detective Williams testified that there were cigarette butts found among the bits of the trash found right near where the gun was recovered. So again, there's two possible conclusions, but it's the state's burden to prove beyond a reasonable doubt, and when you look at it from that standpoint, which is how the jury should have looked at it, the manifest way to the evidence dictates that we find that this was not a rational prior fact. It was swayed  in the case, but applying the standard of reasonable doubt, the jury's finding was against the manifest way to the evidence. Thank you, Your Honor. Thank you, Mr. Whitney. Ms. McCormick, take the matter under advisement.